E-FILED
Thursday, 19 August, 2021  06:39:54 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LISA JOHNSON-BARKER, as Administrator of the Estate of Markus Johnson, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| WEXFORD HEALTH SOURCES, INC.; THE ILLINOIS DEPARTMENT OF CORRECTIONS; ROB JEFFREYS; JUSTIN YOUNG; NITIN THAPAR; JUSTIN DUPREY; LAWISHA CARTER; MELANIE EASTON; ALEXIS JOSEPH; NURSE DAVIS; ANASTASIA GOIN; KRYSTA KINCAID; SANDY LEMON; TINA MILES; COLLEEN SHULTS; ANGELICA WACHTOR; COURTNEY WALKER-HENRY; VICTOR CALLOWAY; FELICIA ADKINS; JOHN BURGER; DEREK HINCHMAN; MAJOR PICKETT; CORY BROOKS; DANIEL MCELROY; MATTHEW MORRISON; SGT. SHACKMAN; OFFICER ADKINS; BRIAN BAKER; RYAN BELL; JOSHUA HARMON; BROCK HERRIN; THOMAS HUNTER; JESS JENKINS; ALEXANDER KEELING; SCOTT KELLERHAUS; BRADLEY MCCALL; DANIEL POTTER; DAVID SHERRELL; BRANDON WILLIFORD; RAYMOND WITHERS; and ZANE YOUHAS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Lisa Johnson-Barker, as Administrator of the Estate of Markus

Johnson, by and through her attorneys, Loevy & Loevy, complains of Defendants

Wexford Health Sources, Inc., the Illinois Department of Corrections, Rob Jeffreys, Justin Young, Nitin Thapar, Justin Duprey, Lawisha Carter, Melanie Easton, Alexis Joseph, Nurse Davis, Anastasia Goin, Krysta Kincaid, Sandy Lemon, Tina Miles, Colleen Shults, Angelica Wachtor, Courtney Walker-Henry, Victor Calloway, Felicia Adkins, John Burger, Derek Hinchman, Major Pickett, Cory Brooks, Daniel McElroy, Matthew Morrison, Sgt. Shackman, Officer Adkins, Brian Baker, Ryan Bell, Joshua Harmon, Brock Herrin, Thomas Hunter, Jess Jenkins, Alexander Keeling, Scott Kellerhaus, Bradley McCall, Daniel Potter, David Sherrell, Brandon Williford, Raymond Withers, and Zane Youhas, and states as follows:

## Introduction

1.      Markus Johnson died at Danville Correctional Center on September 6, 2019 of severe dehydration. He was just 21 years old.

2.      Markus's death occurred slowly, over the course of several weeks, as the correctional and medical staff charged with protecting him documented his persistent refusals to eat or drink but took no action to save his life.

3.      Markus's refusal to eat or drink was the result of Markus's temporary loss of contact with reality because of his mental illness, schizoaffective disorder. Defendants knew about Markus's mental illness, and they knew multiple ways to address it so that Markus could be returned to stable physical and mental health.

4.      Instead, Defendants did nothing as Markus slowly wasted away in front of their eyes. On the day of his death, Markus was just a few months away

2

from being able to rejoin his family, who had provided him ample support for his mental illness throughout his life.

5.      Markus was a beloved son, brother, and uncle. He was taken away from his family because of Defendants' egregious indifference. This action, brought pursuant to 42 U.S.C. § 1983, seeks to hold Defendants accountable for their disregard of human life.

## Jurisdiction and Venue

6.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

## Parties

8.      Plaintiff Lisa Johnson-Barker is the mother of Markus Johnson, and the duly appointed Administrator of the Estate of Markus Johnson. Markus Johnson's estate was filed in the Probate Division of the Circuit Court of Lake County, Illinois.

9.      At all times relevant to the events at issue in this case, Markus Johnson was in the custody of the Illinois Department of Corrections (IDOC).

10.      Defendant Wexford Health Sources, Inc. (Wexford) is a corporation headquartered in Pennsylvania transacting business in Illinois. Wexford, pursuant to a contract with the state of Illinois, is a healthcare provider for IDOC prisons

throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of policies and practices at Danville and the IDOC generally. As an agent of IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants and other unknown healthcare employees at Danville.

11.     Defendant IDOC is an entity of the State of Illinois. The IDOC operates Danville Correctional Center and had custody of Markus Johnson at all times relevant to the events at issue in this case.

12.     Defendant Rob Jeffreys is the Director of the IDOC. Defendant Jeffreys is sued here in his official capacity.

13.     At all times relevant to his involvement in this case, Defendant Justin Young was the Medical Director at Danville, an employee of and final policymaker for Wexford, and was responsible for the implementation, oversight, and supervision of policies and practices at Danville. Defendant Dr. Young is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Young was acting under color of law and within the scope of his employment with Wexford.

14.     At all times relevant to his involvement in this case, Defendant Nitin Thapar was a psychiatrist at Danville. Defendant Thapar is sued here in his individual capacity. At all times relevant to the events at issue in this case,

4

Defendant Thapar was acting under color of law and within the scope of his employment with Wexford.

15.    At all times relevant to his involvement in this case, Defendant Justin Duprey was a nurse practitioner at Danville. Defendant Duprey is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Duprey was acting under color of law and within the scope of his employment with Wexford.

16.    At all times relevant to their involvement in this case, Defendants Lawisha Carter, Melanie Easton, and Alexis Joseph were "qualified mental health providers" at Danville. These Defendants are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Carter, Easton, and Joseph were acting under color of law and within the scope of their employment with Wexford.

17.    At all times relevant to their involvement in this case, Defendants Nurse Davis, Anastasia Goin, Krysta Kincaid, Sandy Lemon, Tina Miles, Colleen Shults, Angelica Wachtor, and Courtney Walker-Henry were nurses at Danville. These Defendants are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Davis, Goin, Kincaid, Lemon, Miles, Shults, Wachtor, and Walker-Henry were acting under color of law and within the scope of their employment with Wexford.

18.    At all times relevant to his involvement in this case, Defendant Victor Calloway was the warden at Danville. Defendant Calloway is sued here in his

individual capacity. At all times relevant to the events at issue in this case, Defendant Calloway was acting under color of law and within the scope of his employment with the IDOC.

19.     At all times relevant to her involvement in this case, Defendant Felicia Adkins was the assistant warden of programs at Danville. Warden Adkins is sued here in her individual capacity. At all times relevant to the events at issue in this case, Warden Adkins was acting under color of law and within the scope of her employment with the IDOC.

20.     At all times relevant to their involvement in this case, Defendants John Burger, Derek Hinchman, and Major Pickett were correctional majors at Danville. These Defendants are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Burger, Hinchman, and Pickett were acting under color of law and within the scope of their employment with the IDOC.

21.     At all times relevant to their involvement in this case, Defendants Cory Brooks, Daniel McElroy, and Matthew Morrison were correctional lieutenants at Danville. These Defendants are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Brooks, McElroy, and Morrison were acting under color of law and within the scope of their employment with the IDOC.

22.     At all times relevant to his involvement in this case, Defendant Sgt. Shackman was a correctional sergeant at Danville. Defendant Shackman is sued

here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Shackman was acting under color of law and within the scope of his employment with the IDOC.

23.     At all times relevant to their involvement in this case, Defendants Officer Adkins, Brian Baker, Ryan Bell, Joshua Harmon, Brock Herrin, Thomas Hunter, Jess Jenkins, Alexander Keeling, Scott Kellerhaus, Bradley McCall, Daniel Potter, David Sherrell, Brandon Williford, Raymond Withers, and Zane Youhas were correctional officers at Danville. These Defendants are sued here in their individual capacities. At all times relevant to the events at issue in this case, Defendants Adkins, Baker, Bell, Harmon, Herrin, Hunter, Jenkins, Keeling, Kellerhaus, McCall, Potter, Shackman, Sherrell, Williford, Withers, and Youhas were acting under color of law and within the scope of their employment with the IDOC.

## Allegations

24.     At the time of his death, Markus Johnson was 21 years old. He had been imprisoned at Danville Correctional Center (Danville) since approximately December 2018. During the approximately nine months that Markus was in IDOC custody, Markus's mother, Lisa Johnson-Barker, spoke with Markus nearly every single day, and his family visited with him on multiple occasions.

25.     Markus was a cherished member of his family. Markus was devoted to his mother, Lisa, who he lived with throughout his life. Markus frequently helped his mother with shopping and other chores necessary to maintain their home.

26.     Markus was also devoted to his siblings and their children. Markus would often play with his nieces and nephews, taking them out to the park to enjoy the outdoors. On Sunday evenings, the family would come to Lisa's house for supper, and Markus was a consistent presence, making jokes to make his family smile.

27.     Markus was diagnosed with depression just before high school, and while in high school, Markus was also diagnosed with schizophrenia or a similar disorder. Markus was prescribed medications to address his mental illness.

28.     In approximately July 2018, Markus was arrested and taken to the Lake County Jail. Immediately after his arrest, Markus's mother brought his medications to the Jail and informed them of his mental health needs.

29.     Lake County Jail staff maintained Markus on a medication regimen that included Olanzapine, an antipsychotic, and Lithium, a mood stabilizer. Staff at the jail noted that Markus's demeanor was appropriate and he was stable while on these medications.

30.     In December 2018, Markus was transferred to the Illinois Department of Corrections (IDOC). Markus's mandatory supervised release date was January 23, 2020.

31.     Markus was initially transferred to Stateville's Northern Reception Center, where he reported his mental health history, including a history of multiple hospitalizations for psychiatric treatment. Markus's medications were continued and he was referred to a psychiatrist.

32.     Markus was transferred to Danville approximately one week later, where he was referred to be seen by mental health and psychiatric staff, including Defendants.

33.     Approximately two weeks after he arrived at Danville, Defendant Dr. Thapar diagnosed Markus with schizoaffective disorder, bipolar type. Dr. Thapar noted Markus's numerous psychiatric hospitalizations in the past, as well as Markus's reports of depression, sleeplessness, feelings of worthlessness, and anxiety. Thapar continued Markus's prescriptions for Olanzapine and Lithium, and added a prescription for Remeron, an antidepressant.

34.     Schizoaffective disorder is a chronic mental illness with no known cure. It often manifests through periods of severe symptoms, including a loss of contact with reality, followed by periods of improvement and clarity. It is widely acknowledged that patients with schizoaffective disorder must be provided careful and frequent monitoring and treatment, including medication and therapy.

35.     Defendant Counselor Easton noted in a separate evaluative encounter that Markus was suffering signs of depression and mania. Easton further noted that Markus experienced paranoid delusions, visual and auditory hallucinations, and fears that people were out to get him.

36.     During her encounter, Counselor Easton noted that Markus required special treatment in a residential treatment unit. Yet she took no action to ensure that Markus received this necessary and appropriate level of care.

37.     Defendants, including Defendant Easton, additionally noted that Markus was "seriously mentally ill"—a designation that required staff, including Defendants, to closely monitor his medical and mental health status. This careful monitoring was necessary, among other things, to ensure that Markus would not harm himself.

38.     Despite knowing the severity of Markus's mental illness, Defendants provided woefully inadequate mental health care to Markus. Markus's mental health "plan" consisted of just one virtual 10–15-minute meeting with Defendant Thapar every 1-2 months and a monthly group class.

39.     On July 3, 2019, Markus informed Dr. Thapar that he wanted to discontinue his mental health medications. On information and belief, Dr. Thapar knew that discontinuation of Markus's mental health medications required meaningful therapy and close monitoring of Markus's mental state in order to address the known risk to Markus's health. Yet Thapar simply discontinued Markus's prescription without any such monitoring or therapy, and instead merely scheduled Markus for a routine 15-minute session the following month.

40.     On July 31, Markus reported that he wanted to remain off medication. On information and belief, Dr. Thapar knew that Markus's mental health disorders required meaningful therapy and close monitoring in order to protect Markus from a substantial risk of harm while he was unmedicated.

41.     Rather than provide that treatment or take action to ensure that such treatment was provided, however, Dr. Thapar simply discharged Markus from the

psychiatric caseload, removing him from the regular care or observation of a psychiatrist and recommending no additional mental health treatment for Markus's severe mental illness whatsoever.

42.     Markus's mental health rapidly deteriorated. Markus began suffering symptoms indicative of a loss of contact with reality. Defendant Counselor Joseph observed the decline in Markus's mental health and knew that this decline presented a substantial risk of Markus's health, but took no meaningful action to ensure that Markus received medical or mental health treatment to address his mental status.

43.     Around this time, Markus began refusing meals. Between July 1st and July 12th, his weight dropped from 272 pounds to 258 pounds. Refusal to eat has long been identified as a schizophrenic symptom and can lead to death if left untreated.

44.     On August 7, Defendants Nurse Goin and Dr. Young noted that Markus had suffered a cut to his left wrist. At the time of their encounter, Markus's need for immediate mental health services was obvious. Despite observing Markus's need for mental health services, neither Nurse Goin nor Dr. Young took any action to ensure that Markus received medical or mental health treatment to address his mental status.

45.     On August 12, Markus was taken to the healthcare unit after reporting a conflict with his cellmate. During the encounter, Markus's need for immediate mental health services was obvious, but Defendant Nurse Lemon, who

evaluated Markus that day, took no action to provide mental health services for Markus.

46.     Instead, Markus was taken to segregation. The day after his arrival, Sgt. Strubberg, who worked in the segregation unit, summoned Counselor Easton after observing that Markus was acting strangely, was not responding to staff, and refused to eat. Markus reported to Easton that he was suffering symptoms of psychosis and wanted to resume his medication regimen. Counselor Easton noted that at the time of their encounter, Markus was exhibiting signs of depression and psychosis. An evaluation of Markus's suicide potential indicated that Markus had several risk factors present to suicidality.

47.     Counselor Easton also noted that Markus was refusing to eat. Easton knew that Markus's emergent mental state, combined with his refusal to eat, put him at imminent risk of serious harm. Yet she took no meaningful action to address Markus's refusal to eat. Instead, Easton simply ordered that Markus be placed on close supervision without any instructions, guidance, or plan regarding Markus's nutritional health.

48.     Counselor Easton notified Nurse Goin of Markus's mental health condition, including his refusal to eat. But Nurse Goin, like Counselor Easton, took no action to address it.

49.     On August 14th, Defendant Counselor Carter and Dr. Thapar saw Markus for a 15-minute "crisis follow up" meeting. Markus reported that he was suffering auditory and visual hallucinations, including voices telling him to harm

himself because he was worthless. Dr. Thapar noted that Markus was suffering worsening signs of psychosis, and that his judgment was poor.

50.     At the time of their encounter, Defendants Carter and Thapar also knew that Markus had been refusing meals. These Defendants knew that refusal to eat or drink is a well-known and dangerous schizophrenic symptom. Despite that knowledge, however, Defendants did not refer Markus for any kind of physical health evaluation or create any plan to monitor or follow up on Markus's food or liquid intake. And although Dr. Thapar reissued Markus's prescription for Olanzapine and Lithium, he took no action to follow up with Markus to ensure that he was taking his medications or observe whether his mental health improved, remained static, or continued to decline.

51.     Defendants Carter and Thapar ordered Markus to be placed on a 10-minute suicide watch. While on suicide watch, Markus was locked in a cell with nothing except for a smock, mattress, and finger foods at meal times.

52.     In the days and weeks that followed, Markus's mental health continued to decline. He refused all medications and refused to be evaluated for suicidality. He was "unresponsive" when Dr. Young asked to remove sutures that had been placed on his wrist a few weeks earlier. He did not get out of bed for days at a time. Defendants, including Defendants Thapar, Easton, Joseph, Carter, Walker-Henry, Wachtor, and Kincaid, were aware of these facts through their interactions with Marcus, and aware that Markus was suffering a mental health emergency, but failed to take any meaningful action whatsoever in response.

Defendants Carter and Joseph, for example, simply noted that Markus's prognosis was "poor" without taking any meaningful action whatsoever.

53.     Markus also continued to refuse to eat or drink. Between August 13 and September 6 (when he died), Markus ate just three meals, and on one occasion drank a juice and a milk. Between August 22 and September 6, Markus ate only one meal. Markus's refusals to eat or drink were documented in crisis watch logs, which Defendants were required to review.

54.     Despite knowing that Markus was not eating or drinking, and despite knowing the resulting imminent threat to Markus's health, Defendants took no meaningful action.

55.     During this period, Markus's weight dropped drastically from approximately 258 pounds to 197 pounds.

56.     At one point before his death, correctional staff summoned Counselor Easton to speak with Markus because Markus was not eating. At the time of their encounter, Markus was disoriented without any concept of time and appeared not to know who Counselor Easton was. Markus told Easton he was not eating and could not provide a date when he had eaten last. Despite this alarming notice, Easton took no meaningful action to ensure that Markus received the emergency medical or mental health treatment he so desperately needed.

57.     On August 21, Correctional Officer Grubb reported to Defendants Lt. Matthew Morrison and Assistant Warden Adkins that Markus had refused his breakfast tray and had missed at least four meals. In fact, their records show that

Markus had been consistently refusing food and drink since being placed on close supervision on August 13th, with only a few exceptions. But neither Lt. Morrison nor Warden Adkins took any action to ensure that Markus received medical or mental health attention for his refusal to eat.

58.     On August 22, Defendant Lt. Morrison escorted Markus to the health care unit for a mandatory blood draw ordered by Dr. Young. This blood draw was not ordered because of Markus's rapidly deteriorating health due to his documented refusal to eat or drink. Rather, it was to ensure the health of a guard whom Markus had poured an unidentified liquid (likely water) on several days earlier was not in jeopardy. When Markus would not voluntarily provide blood, Danville's Tactical Team was assembled to complete an involuntary lab draw.

59.     Defendant Nurses Shults and Wachtor performed the blood draw. Defendants Shults and Wachtor, along with Defendants Morrison and Young, were aware of Markus's ongoing refusal to eat or drink, his significant weight loss, and his obvious psychosis when they encountered him on August 22. But neither Morrison nor Young took any action to ensure that Markus received the medical or mental health care necessary to address the known serious risk to Markus's health. Among other things, Lt. Morrison took no action to request or ensure that Markus was evaluated or treated for his refusal to eat or drink. And Dr. Young took no action to evaluate Markus's nutrition and hydration levels or to form a monitoring and treatment plan.

60.     Dr. Young noted that the results from the blood labs taken on August 22 were "abnormal," but he took no further action to evaluate or treat Markus.

61.     By this time, Markus had begun exhibiting signs of extreme dehydration that would have alerted Defendants to his need for emergency medical attention.

62.     On August 23, for example, Defendant Officer Hunter called a "Code 3"—a code that refers to a medical emergency—after Markus told him that he was suffering chest pains. A rapid heartbeat and accompanying chest pains are clear signs of severe dehydration. Defendants Simmons, Kincaid, and Davis came to Markus's cell, and Defendants Warden Adkins and Major Hinchman were notified. Defendants knew that Markus was refusing to eat or drink, and were aware of a substantial risk to Markus's health from his refusal to eat or drink, but took no action to ensure that Markus received the emergency medical and mental health treatment he needed. To the contrary, after a brief visit to Danville's health care unit, and with Dr. Young's blessing, Nurse Kincaid returned Markus to his cell without any follow-up plan whatsoever.

63.     On August 27, Markus told Counselor Easton that he was attempting to starve himself. Defendant Easton noted Markus's intention to starve himself, but on information and belief took no meaningful action to ensure that Markus received the emergency medical and mental health treatment he so obviously needed.

64.     The next day, Defendant Nurse Courtney Walker-Henry noted that she had been informed that Markus had been on a "hunger strike" since at least August

16

22. Walker-Henry informed correctional staff that Markus needed to be brought to the health care unit for evaluation. When Markus refused, Walker-Henry contacted Dr. Young, who did not answer. But Walker-Henry did not leave a voicemail and other than leaving a message on Dr. Young's "office door," took no action to respond to this clear indication of a medical emergency.

65.     Dr. Young similarly took no action in response to this emergent situation. Although Defendants can and do remove prisoners from their cells for involuntary medical lab draws—like the involuntary lab draw performed on Markus at the request of correctional staff after an encounter with an officer—Defendants took no action to evaluate Markus's declining medical and mental health status with or without his consent. Defendants knew at the time of their inaction that Markus had not consumed *any* food since August 22 and had consumed little to nothing prior to that date.

66.     During the overnight shift on August 30-31, Defendant Officer Baker brought Markus a meal tray, which he again refused. At shift change, Officer Baker learned from Defendant Officer Keeling that Markus had not accepted any meals since August 22. Despite that knowledge and knowing that refusing to eat or drink for such a sustained period posed a substantial risk to Markus's health, neither Defendant Baker nor Defendant Keeling took any action to ensure that Markus received an evaluation or treatment by medical or mental health staff.

67.     On September 1, Markus complained to that his tongue hurt. This is a symptom of severe dehydration. Officer Williford recorded Markus's complaint in

17

his observation log, but took no further action to alert medical or mental health staff, or otherwise ensure that Markus received adequate medical and mental health treatment.

68.     On September 3, Markus again told Defendants Carter and Morrison that he was not eating. At this point, Markus's significant weight loss was obvious. Markus was also observably disoriented and uncoordinated. Yet neither Defendant Carter nor Defendant Morrison called for emergent medical treatment or otherwise ensured that Markus received direly needed medical care.

69.     By at least September 3, Defendants Carter, Joseph, and Easton, among others, knew that Markus needed a higher level of mental health care than he was receiving at Danville. Yet none of these Defendants took any adequate action to ensure that Markus received the mental health care that Defendants knew he required.

70.     Defendants continued to ignore Markus's refusal to eat or drink until Markus told another officer, Defendant Jenkins, that he was on a hunger strike on September 4. Jenkins observed that Markus was very weak. Despite the fact that it was obvious at this point that Markus required medical attention, Jenkins did not report a medical emergency or otherwise ensure that Markus received the emergency medical and mental health treatment he obviously required. Instead, Jenkins reported the issue to Lt. Morrison on September 4 and started a Hunger Strike Log.

71.     By this point, Markus had eaten virtually nothing during his three weeks on crisis watch and was obviously weak. Despite these facts and the fact that Lt. Morrison had now been directly notified of Markus's persistent refusal to eat or drink on multiple occasions, Morrison took no meaningful action. Instead, he simply notified Defendants Shults and Carter of Markus's situation. These Defendants similarly took no action to ensure that Markus received adequate medical or mental health care in light of his repeated refusals to eat or drink.

72.     The Hunger Strike Log demonstrated, yet again, that Markus was not consuming any food or liquid. And it further confirmed, yet again, that Markus rarely engaged in any movement whatsoever and did not excrete any fluids through urination.

73.     On the morning of September 5, Defendant Nurse Wachtor observed that Markus had a wound on his thigh. Nurse Wachtor knew that Markus was in the throes of active psychosis, refusing all food and fluids on multiple occasions and attempts to communicate. Nurse Wachtor was aware that Markus's condition was dire and that he required emergency medical treatment. But instead of sending him to the emergency department, Wachtor simply called Drs. Young and Thapar to notify them of Markus's condition.

74.     Drs. Young and Thapar were similarly aware of Markus's dire need for emergency medical treatment. Like Nurse Wachtor, they did not send Markus to an emergency department for the emergency medical treatment he so desperately

required. Instead, they simply ordered that labs be taken and ordered that Markus be returned to segregation.

75.    Later that afternoon, Defendant Major Hinchman notified Defendant Joseph and other Defendants in the healthcare unit of Markus's continued hunger strike. When Defendants reported that they would evaluate Markus later, Major Hinchman took no other action to ensure that Markus received the emergency medical and mental health care that he so clearly needed. Hinchman notified Warden Adkins of his actions and inactions, as well as Markus's emergent condition. Warden Adkins similarly took no action to secure emergency care for Markus.

76.    A few hours later, Lt. Simmons saw that Markus was bleeding from his groin area, and was not responsive to any directions from correctional staff. Lt. Simmons knew that Markus had not had any meaningful food or liquids for several days and knew that Markus was suffering an obvious break with reality. Lt. Simmons called Nurse Walker-Henry, who asked Lt. Simmons to bring Markus to the healthcare unit. When Markus did not respond to Lt. Simmons's orders to come to the cell for transport to the healthcare unit, however, both Defendants Simmons and Walker-Henry simply gave up. They knew that Markus's non-responsiveness was a symptom of his emergent mental illness and knew that he required emergency medical attention. Yet neither Defendant took any action to ensure that he received it. Simmons notified Major Hinchman of Markus's injury and his actions. Hinchman similarly took no action to secure emergency care for Markus.

77.     An hour later, Nurse Walker-Henry spoke with Dr. Young. Dr. Young was aware of Markus's refusal to eat or drink, his rapidly deteriorating mental health, and his need for emergency medical attention. Dr. Young told Nurse Walker-Henry that Markus needed to be brought to the infirmary so that he could be monitored, and called Major Hinchman to report that correctional staff may be needed to escort Markus to the healthcare unit if he was unwilling to go. But Major Hinchman refused, reporting that Danville was short-staffed that shift.

78.     When Markus was non-responsive to officers' commands regarding his transport to the healthcare unit, Dr. Young and Nurse Walker-Henry simply gave up. Defendants Young and Walker-Henry knew that Markus needed emergency medical attention, and knew that Markus's non-responsiveness was a symptom of his emergent mental illness. But neither Defendant took any action to ensure that Markus's emergent medical and mental health needs were addressed.

79.     Markus's wound near his groin continued to bleed extensively. Yet Officer Hunter, who was tasked with conducting close supervision of Markus, took no action to secure medical attention for Markus. In fact, Officer Hunter left his shift that evening without taking any action whatsoever.

80.     Immediately after shift change, another correctional officer noticed the large amount of blood that had soaked Markus's mattress from his wound. When Markus would not respond to any questions, a Code 3 was called and Markus was transported to the healthcare unit.

21

81.     In the healthcare unit, Markus encountered Nurses Walker-Henry and Lemon, who observed that Markus was obviously dehydrated and had lost of a lot of weight. Walker-Henry noted a host of symptoms that clearly showed that Markus's condition had reached a critical point and required immediate action, including her observations that Markus's scleras were tinged yellow, his skin was dry, and his mouth was pasty and dry. These are symptoms of severe dehydration.

82.     Nurse Walker-Henry also noted Markus's clearly deteriorated mental state, and the fact that the wound in his groin area was draining malodorous pus, a sign of infection. On information and belief, Nurse Lemon observed all of these signs and symptoms.

83.     Nurse Walker-Henry notified Dr. Young of the situation and Markus's condition. As described above, Dr. Young was well aware of Markus's need for emergency medical care. But rather than take any action whatsoever to ensure that Markus received the care he needed—including through transport to an emergency department—Dr. Young simply directed staff to "monitor" Markus.

84.     Defendants Walker-Henry and Lemon knew that Dr. Young's response was woefully inadequate and that continued inaction posed an imminent risk to Markus's health and safety. But rather than take any action to provide the emergency care that they knew were necessary, Defendants Walker-Henry and Lemon simply directed that staff place Markus in a cell in the infirmary. Defendants Walker-Henry and Lemon provided Markus with no medical attention whatsoever, much less the emergent treatment warranted by the fact that he had

gone weeks without any meaningful food or liquid intake, was found unresponsive in his cell, with significant blood loss, and with numerous symptoms of severe dehydration. The wound that had caused the blood loss was left untreated.

85.   Defendants Pickett, Brooks, Shackman, Withers, and Potter were all present during the interactions with Markus in the healthcare unit on the night of September 5. They, too, saw Markus's obvious need for emergency medical attention. Indeed, the need for emergency care could not have been clearer. But rather than take any action to provide it, these Defendants simply secured Markus in the cell without taking any action to ensure Markus received the necessary care.

86.   A few minutes later, Defendant Officer Youhas was assigned to monitor Markus in the healthcare unit. Like the other Defendants before him, Officer Youhas could see that Markus was in desperate need of medical attention. But Youhas took no action to ensure it was provided.

87.   The following morning, September 6, Markus's critical condition became even more apparent. At approximately 8:30 or 9 a.m., Markus had white froth around his mouth, had sunken facial features, and appeared extremely dehydrated. Defendants Duprey, Morrison, Carter, and Adkins all observed Markus and knew he needed emergency care. But no ambulance was called or emergency medical care provided. Instead, Defendants took no action to address Markus's condition until approximately 1:20 p.m. when Danville's tactical team was called to remove Markus from his cell for lab work.

88.     Before the tactical team was called, at approximately 9:45 a.m., Defendant Warden Calloway came to the healthcare unit and interacted with Markus. Warden Calloway knew that the time of their interaction that Markus had been refusing to eat or drink, and could see Markus's emergent physical condition. Despite that knowledge, Warden Calloway took no action to ensure that Markus received any medical treatment whatsoever.

89.     By this point, Markus was extremely lethargic, weakened, and his severe symptoms were extremely obvious. The tactical team that was assembled—comprised of Defendants Kellerhaus, McElroy, Herrin, McCall, Sherrell, and Bell—observed that Markus was groaning and lying on the floor naked in his cell, and appeared disoriented and confused. Markus did not resist Defendants' efforts to secure him, but was nevertheless pepper sprayed twice by Defendant Kellerhaus. When Markus attempted to slowly stand up, he slipped on the pepper spray and fell. Markus could not get back up and sat on the floor. Defendants entered the cell and placed Markus in handcuffs, which Markus did not resist.

90.     Markus was so weakened that he was unable to walk unassisted. Two correctional officers were needed to support him; he was then put in a wheelchair.

91.     Despite his critical condition and need for emergency life-saving measures, Defendants provided Markus with absolutely no treatment. Instead, the nurses on duty in the healthcare unit, Defendants Wachtor, Pearson, and Miles only completed the routine lab work of drawing his blood, taking a urine sample, and cleaning the area around the open wound.

24

92.     Nurse Wachtor contacted Dr. Young and reported that Markus "didn't look right." Wachtor further reported to Dr. Young that she was unable to obtain Markus's vital signs and requested that he be sent to the emergency department. Dr. Young refused to allow Markus to be transported to the emergency department so forcefully that Nurse Wachtor began to cry.

93.     Not only was Markus denied any emergency medical care, but his lab results were not even treated with a sense of urgency. Nurse Wachtor requested that Dr. Young order the labs to be processed "stat"—the highest priority—but Dr. Young refused.

94.     During the lab draws, Markus was groaning in pain and complained several times to Defendants McElroy, Bell, Herrin, McCall, Sherrell, Wachtor, Pearson, and Miles that he could not breathe. His complaints were ignored.

95.     In total, Markus was in the infirmary for approximately 40 minutes. Defendants then returned Markus to his cell. Nurse Wachtor stated that Markus was "cleared" to be left in his cell. Defendants could see that Markus's face was sunken in, his mouth was extremely dry and webbed with "stringy stuff," he was obviously severely dehydrated and clearly in need of immediate medical attention. But at approximately 2:25 p.m., Defendants Herrin, Harmon, Sherrell, Kellerhaus, Bell, and McElroy placed Markus on his bed and left.

96.     Nurse Wachtor later admitted that at the time that Defendants left Markus in his cell, she knew Markus was dying and that he was cold and his eyes were rolling back into his head.

97.     Sometime later, Defendants Wachtor and Duprey approached Markus's cell to take Markus's vital signs. But Defendant Officer Harmon refused to permit them to enter. Instead, Harmon forced Defendants Wachtor and Duprey to wait until Defendants Morrison and Burger came to the healthcare unit. Nurses Walker-Henry and Kincaid also arrived on the scene.

98.     Everyone knew the emergency that was unfolding. Yet none of the Defendants took any action to arrange for emergency transportation for Markus to an emergency department for treatment, or to otherwise secure him emergency medical care.

99.     Instead, Defendants Morrison, Burger, Walker-Henry, Kincaid, Wachtor, Duprey, and Harmon observed Markus's unresponsiveness for several minutes before finally entering the cell.

100.    Nurse Practitioner Duprey was unable to locate a pulse on Markus, and noted he was ice cold to the touch. Yet even at this point, when Duprey contacted Dr. Young, Dr. Young directed *not* that Markus be taken immediately to the emergency room, but instead that Markus be removed from his cell and re-evaluated.

101.    Nurse Practitioner Duprey directed correctional staff to call an ambulance anyway. But before they arrived, Markus became totally unresponsive. Attempts at CPR were unsuccessful, and by the time EMTs arrived, Markus was dead.

102.    An autopsy later concluded that Markus had died of severe dehydration. Dr. Shiping Bao, the forensic pathologist who conducted Markus's autopsy, noted during the autopsy that Markus's body was one of the driest he had ever seen.

103.    Markus's family deeply grieves his loss to this day. Rather than welcoming Markus home in January 2020, or even sooner, Markus's family has been forced to live with the fact that they will never get to spend time with Markus again. Their grief is amplified by the fact that Markus's death was entirely preventable

## COUNT I
## 42 U.S.C. § 1983 – Deliberate Indifference (Eighth Amendment)
## All Defendants

104.    Each of the Paragraphs of this Complaint is incorporated herein.

105.    In the manner described more fully above, Defendants were aware that Markus's medical and mental health condition caused him to face a substantial risk of serious harm without appropriate action.

106.    Despite that knowledge, Defendants failed to provide Markus with proper medical and mental health care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

107.    Defendants' actions and failures to act were unreasonable and undertaken intentionally, with malice, and/or with reckless indifference to Markus Johnson's rights.

27

108.    As a result of Defendants' unjustified and unconstitutional conduct, Markus experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

109.    Defendants were deliberately indifferent to Markus's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Markus Johnson's rights.

110.    Markus's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by the policies and practices of Defendant Wexford Health Sources, Inc.

111.    At all times relevant to the events at issue in this case, Defendant Wexford contract with the IDOC to provide healthcare to men housed in IDOC prisons, including Markus. As the provider of healthcare services, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

112.    Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional staff at Danville and other prisons pursuant to which prisoners like Markus with serious medical needs were routinely denied adequate medical care. It is common within the IDOC to see prisoners with clear symptoms of serious medical needs whose treatment is routinely delayed or completely ignored by healthcare and correctional employees.  Despite knowledge of these problematic policies and

practices, Defendant Wexford did nothing to ensure that prisoners in IDOC received adequate medical care and access to medical care, thereby acting with deliberate indifference.

113.   Specifically, there exist policies and/or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare staff fail to adequately examine or diagnose patients in their care; (2) healthcare staff fail to create a sensible treatment plan for patients whose medical and mental health status clearly require the creation of a treatment plan; (3) healthcare staff fail to perform differential diagnoses; (4) healthcare staff fail or refuse to provide for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper; (5) healthcare staff fail to communicate with correctional staff, even when such communication is obviously necessary to protect the health and safety of prisoners; and (6) healthcare staff either refuse or are prohibited from contacting emergency medical services (i.e., 911), even when such contact is emergently necessary, among others.

114.   These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services within the IDOC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Markus's

rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

115.    The above-described practices, so well-settled as to constitute de facto policy within the IDOC, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

116.    Wexford also acted to violate Markus's constitutional rights through the actions of its employees who were delegated final policymaking authority by Wexford.

117.    Markus Johnson's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

## COUNT II
## 42 U.S.C. § 12101 – Americans with Disabilities Act
### Defendants IDOC and Jeffreys

118.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

119.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity." 42 U.S.C.
§ 12132.

120.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public
entity to "make reasonable modifications in policies, practices, or procedures when
the modifications are necessary to avoid discrimination on the basis of disability,
unless the public entity can demonstrate that making the modifications would
fundamentally alter the nature of the services, program, or activity."

121.    The IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

122.    Markus Johnson had a disability within the meaning of the Americans
with Disabilities Act. He was otherwise qualified to participate in programs,
services, or benefits offered by the IDOC, including but not limited to access to
medical and mental health services, nutrition and hydration services, and access to
the IDOC's hunger strike policy and the protections it affords to prisoners once it is
invoked.

123.    Under Title II of the ADA and 28 C.F.R. § 35.130(a), the IDOC is
responsible for ensuring that individuals in its custody with known disabilities are
provided with reasonable accommodations to prevent discrimination on the basis of
disability and are not, on the basis of disability, excluded from participation in or
denied the benefits of its services, programs, or activities because of their disability.

124.    Despite Markus Johnson's known and obvious disability, the IDOC
failed to reasonably accommodate his disability and discriminated against him, as
described herein.

125.   Because of Markus Johnson's disability, the IDOC excluded and denied him access to each program, service, or benefit described herein. Thus, Mr. Johnson was subjected to discrimination in violation of the ADA.

126.   As a result of the IDOC's discrimination Markus Johnson suffered injuries, including pain and suffering, and ultimately death.

## COUNT III
## 29 U.S.C. § 701 – Rehabilitation Act
## Defendants IDOC and Jeffreys

127.   Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

128.   Markus Johnson had a disability within the meaning of the Rehabilitation Act. He was otherwise qualified to participate in programs, services, or benefits offered by the IDOC, including but not limited to access to medical and mental health services, nutrition and hydration services, and access to the IDOC's hunger strike policy and the protections it affords to prisoners once it is invoked.

129.   Under the Rehabilitation Act, the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

130.   The IDOC receives federal funding.

131.    Despite Markus Johnson's known and obvious disability, the IDOC failed to reasonably accommodate his disability and discriminated against him, as described herein.

132.    Because of Markus Johnson's disability, the IDOC excluded and denied him access to each program, service, or benefit described herein. Thus, Mr. Johnson was subjected to discrimination in violation of the Rehabilitation Act.

133.    As a result of the IDOC's discrimination Markus Johnson suffered injuries, including pain and suffering, and ultimately death.

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)**
**All Individual Defendants**

134.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

135.    In the manner more fully described above, each of the Defendants had a reasonable opportunity to prevent the violation of Markus Johnson's constitutional rights as set forth above had they been so inclined, but failed to do so.

136.    Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Markus's rights.

137.    As a direct and proximate result of their misconduct, Markus Johnson's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

138.    Mr. Johnson's death was caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT V
### 740 ILCS 180/1 – Wrongful Death
### All Defendants

139.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

140.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to prisoners in their care.

141.    Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

142.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Markus Johnson suffered injuries, including death.

143.    Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

144.    Defendants' actions proximately caused Mr. Johnson great bodily harm and death, as well as great pain and suffering.

145.    Plaintiff Lisa Johnson-Barker, and all other legally recognized family members, claim damages for the wrongful death of Mr. Johnson, and for the loss of his services, protection, care, future income, assistance, society, companionship,

comfort, guidance, counsel and advice, and for the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS 180/1, the Illinois Wrongful Death Act.

## COUNT VI
### 755 ILCS 5/27-6 – Survival Action
### All Defendants

146.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

147.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to prisoners in their care.

148.    Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

149.    The misconduct described in this Count was undertaken with intentional disregard of Markus Johnson's rights.

150.    As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Johnson suffered great conscious pain and suffering prior to his death.

151.    Mr. Johnson filed no action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

152.    Plaintiff Lisa Johnson-Barker, on behalf of the Estate of Markus Johnson, claims damages for the conscious pain and suffering of Mr. Johnson, pursuant to 755 ILCS 5/27-6, commonly referred to as the Illinois Survival Act.

**COUNT VII**
**Respondeat Superior**
**Defendant Wexford**

153.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

154.    In committing the acts alleged in the preceding paragraphs, the above-described Defendants were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment.

155.    Consequently, Defendant Wexford is liable for the actions of its employees acting within the scope of their employment under state law.

156.    Defendant Wexford, as private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

WHEREFORE, Plaintiff Lisa Barker Johnson, as Administrator of the Estate of Markus Johnson, hereby respectfully requests that this Court enter a judgment in her favor and against Wexford Health Sources, Inc., the Illinois Department of Corrections, Rob Jeffreys, Justin Young, Nitin Thapar, Justin Duprey, Lawisha Carter, Melanie Easton, Alexis Joseph, Nurse Davis, Anastasia Goin, Krysta Kincaid, Sandy Lemon, Tina Miles, Colleen Shults, Angelica Wachtor, Courtney

Walker-Henry, Victor Calloway, Felicia Adkins, John Burger, Derek Hinchman, Major Pickett, Cory Brooks, Daniel McElroy, Matthew Morrison, Sgt. Shackman, Officer Adkins, Brian Baker, Ryan Bell, Joshua Harmon, Brock Herrin, Thomas Hunter, Jess Jenkins, Alexander Keeling, Scott Kellerhaus, Bradley McCall, Daniel Potter, David Sherrell, Brandon Williford, Raymond Withers, and Zane Youhas, awarding compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

### Jury Demand

Plaintiff Lisa Johson-Barker hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated:        August 19, 2021

Respectfully submitted,

/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Sarah Grady
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
sarah@loevy.com